[Crim. No. 21542. Feb. 17, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL CHAVERS, Defendant and Appellant.

## COUNSEL

Neil E. Campbell, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Quin Denvir, State Public Defender, and Therene Powell, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Pamela M. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

D. Lowell Jensen, District Attorney (Alameda), and John J. Meehan, Assistant District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**RICHARDSON, J.**—May police officers who act with probable cause to suspect the presence of contraband somewhere in a lawfully stopped vehicle conduct a warrantless search of the vehicle, its glove compartment, and a shaving kit found therein? We conclude that the search was proper and will affirm defendant's conviction based upon it.

Defendant Michael Chavers appeals from a judgment rendered upon his plea of nolo contendere to one count of robbery (Pen. Code, § 211; unless otherwise specified all statutory references are to this code) and use of a dangerous weapon (§§ 1203.06, subd. (a)(1), 12022.5). Prior to entry of his plea, defendant moved pursuant to section 1538.5 to suppress a handgun found by the police inside an opaque plastic shaving kit in the glove compartment in the car in which defendant was riding at the time of his arrest. The present appeal is directed solely at the validity of the trial court's ruling denying that motion to suppress. (§ 1538.5, subd. (m).)

The transcript of the hearing on defendant's section 1538.5 motion reveals the following undisputed facts: On February 28, 1979, about 3 a.m., Police Officers Jones and Paschke responded to a report of an armed robbery at a mini-market attached to a service station and laundromat on Redondo Avenue in

Long Beach. The market's clerk described the suspects as two black men, each approximately six feet tall and cleanshaven. According to the clerk, one suspect wore a blue knit watch cap, a "Levi-type" shirt or jacket, and blue jeans; the other wore blue pants, a brown tank top, and a blue Levi jacket. The clerk's description was corroborated by a witness who had approached the store while the suspects were inside.

The clerk also told the officers that one suspect held a short blue steel revolver and threatened to shoot him. The suspects took from the store some cash (bills and change), a small bag of Lay's potato chips, a six-pack of sixteen-ounce cans of Schlitz beer in a plastic ring carrier and an additional single can of beer.

A truck driver who had pulled into the station to make a delivery at about the time of the robbery described a car which was parked in an alley to the rear of the store, as a standard size, two-door sedan, early 1970's model, possibly white in color. He was uncertain as to its exact color because it was illuminated by yellow sodium street lights.

The information obtained by Officers Jones and Paschke was broadcast over police radio. Shortly thereafter, they were advised by another police unit (Officers Mahakian and Becker) that a vehicle with possible suspects had been detained at a nearby intersection, less than a mile from the scene of the robbery. Jones and Paschke joined Mahakian and Becker and because both the appearance and the clothing of the occupants of the vehicle did not match the clerk's description, they were released.

Officers Mahakian and Becker then observed a light brown 1970 Cadillac with a broken taillight, occupied by two black men, "squeal around the corner" away from the robbery scene at a high rate of speed. The "erratic driving maneuver," excessive speed, and broken taillight attracted the officers' attention; they also noted that the car and its occupants corresponded roughly to the description of the robbery suspects and vehicle. Both police units therefore pursued the Cadillac.

Five minutes later the officers stopped the Cadillac. The occupants, who were cleanshaven and approximately six feet in height, were patted down, handcuffed, and searched for identification.

During the patdown process, Officer Jones, who had originally taken the robbery report, observed a small bag of Lay's potato chips on the dashboard of the vehicle, numerous opened and unopened 16-ounce cans of Schlitz beer in plain sight, and a blue knit watch cap and long-sleeved Levi shirt under the front seat. Officers Mahakian and Becker detained the suspects 15 or 20 feet

from the car while Officers Jones and Paschke continued to search it, looking primarily for the car registration, any other items that might indicate the suspects' identities, the weapon described by the clerk, and any personal belongings for inventory purposes.

In the course of that search, Officer Paschke forced open the glove compartment, which was either locked or malfunctioning. In the compartment he saw miscellaneous papers, loose change, and a black plastic zippered shaving bag. Officer Paschke lifted the bag, noticed that it was very heavy for a shaving kit, felt the outline of a gun in it, opened it and observed a blue steel handgun with six live rounds of ammunition in the cylinder. The police rendered the gun safe and placed the suspects under arrest.

From the foregoing facts, defendant contended that the searches of both the glove compartment and the shaving kit were illegal having been undertaken without a search warrant. The trial court rejected defendant's arguments, and sustained the warrantless search of the glove compartment under the traditional "automobile exception" to the warrant requirement. The trial court also ruled that the opening of the shaving kit did not constitute an unconstitutional infringement upon defendant's privacy interests since the officer had already inadvertently discovered the contents of the kit while removing it from the glove compartment pursuant to a permissible seizure. Accordingly, the trial court denied defendant's motion to suppress the gun.

Defendant's appeal rests upon the sole claim that the trial court erred in this ruling, which ruling we will sustain.

■ The search of the car's interior, including its glove compartment and the shaving kit found therein, was fully consistent with Fourth Amendment principles recently expressed by the United States Supreme Court in *United States* v. *Ross* (1982) 456 U.S. 798 [72 L.Ed.2d 572, 102 S.Ct. 2157]. In *Ross*, by a vote of six to three, the high court reconsidered its prior rulings in *Robbins* v. *California* (1981) 453 U.S. 420 [69 L.Ed.2d 774, 101 S.Ct. 2841], and *Arkansas* v. *Sanders* (1979) 442 U.S. 753 [61 L.Ed.2d 235, 99 S.Ct. 2586].
■ The *Ross* court adopted a rule that police officers who lawfully stop a vehicle, having probable cause to believe that contraband is located or concealed somewhere therein, may conduct a warrantless search of the vehicle that is as thorough (as to location and type of container searched) as that which a magistrate could authorize by warrant. (*Id.*, at p. 824 [72 L.Ed.2d at p. 593].)

In *Ross*, the officers had been informed that the defendant was selling narcotics contained in his car trunk. After lawfully stopping the car and arresting the driver, the officers (acting without a search warrant) opened the car's trunk, found and opened a closed paper bag, and discovered "glassine" bags contain-

ing heroin. A second warrantless search of the vehicle conducted at police headquarters revealed a zippered leather pouch containing cash. Upholding these searches, the Supreme Court ruled that the "automobile exception" to the Fourth Amendment's warrant requirement applies to all car searches which are supported by probable cause to believe that the vehicle contains contraband. The limit of such a search "is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found . . . . [¶] If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (*Id.,* at pp. 824-825 [72 L.Ed.2d at pp. 593-594].)

It is evident that the search before us was proper under *Ross,* for (as discussed below) the record establishes that the officers had probable cause to believe that seizable items, including the fruits of the robbery and the gun used to accomplish it, were concealed somewhere in the car, including its glove compartment and the shaving bag found therein.

Although on occasion we have elected to afford suspects "a broader security against unreasonable searches and seizures than that required by the United States Supreme Court" (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 549 [119 Cal.Rptr. 315, 531 P.2d 1099]; but see Cal. Const., art. I, § 28, subd. (d) [repeal of state exclusionary rule]), the challenged search was also lawful under our own prior decisions, which we now discuss.

### 1. *Search of Car's Interior*

In *Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557 [128 Cal.Rptr. 641, 547 P.2d 417], we examined the general principles which had governed a lawful warrantless search of an automobile in this state. Quoting from earlier cases, we declared that "'officers are empowered under the *Carroll* [*Carroll* v. *United States* (1925) 267 U.S. 132 (69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790)] doctrine to search an automobile as "long as it can be demonstrated that (1) exigent circumstances rendered the obtaining of a warrant an impossible or impractical alternative, and (2) probable cause existed for the search."'" (16 Cal.3d at p. 563, quoting *People* v. *Dumas* (1973) 9 Cal.3d 871, 884 [109 Cal.Rptr. 304, 512 P.2d 1208]; *People* v. *Cook* (1975) 13 Cal.3d 663, 669 [119 Cal.Rptr. 500, 532 P.2d 148].)

Moreover, in explaining the nature of the "exigency" which is required to meet the first prong of the *Carroll* or automobile exception, our *Wimberly* decision—quoting another recent California case—made it clear that sufficient exigency generally exists whenever probable cause is first discovered at the time

the police stop a vehicle and thus have not had a prior opportunity to obtain a warrant. (Cf. *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022].) Significantly, in the sentence immediately following our recitation of the two-pronged test, we stated: "It is therefore manifest that 'when there is probable cause to believe that an automobile stopped on a highway contains contraband, evidence of a crime, or was itself an instrumentality of the commission of one, law enforcement officers need not obtain a warrant before conducting a search . . . .' " (16 Cal.3d at p. 563, quoting *People* v. *Laursen* (1972) 8 Cal.3d 192, 201 [104 Cal.Rptr. 425, 501 P.2d 1145] and citing *People* v. *Superior Court* (*Kiefer*) (1970) 3 Cal.3d 807, 815 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559].)

Indeed, the circumstances of *Wimberly* itself clearly demonstrate that when, as in the instant case, the police discover facts constituting probable cause at the time they stop a vehicle, an immediate on-the-scene search of the vehicle is justified even if there are no additional exigent circumstances necessitating such an immediate search. In *Wimberly,* after stopping a car for erratic driving, the police officers observed marijuana seeds on the floorboard of the passenger compartment and detected a slight odor of marijuana. Although the suspects had already been removed from the car, and there was no indication that the car could not have been secured at the scene or towed to a police garage, we held that because the police had probable cause to believe that the interior of the car contained contraband their immediate in-the-field search of the passenger compartment was permissible. (16 Cal.3d at pp. 563-566; see also *People* v. *Hill* (1974) 12 Cal.3d 731, 747-748 [117 Cal.Rptr. 393, 528 P.2d 1].)

The facts of the instant case are virtually indistinguishable from *Wimberly* in this regard. Here, as in *Wimberly,* the police stopped a suspect vehicle and discovered in plain sight items which the police reasonably believed to be contraband, i.e., the suspected fruits of a very recent robbery. This observation clearly afforded the officers probable cause to enter the car, to seize the items in question, and to search the passenger compartment for additional contraband and other relevant evidence, such as the clothes which were discovered under the passenger seat.

*People* v. *Dumas, supra,* 9 Cal.3d 871, and *People* v. *Cook, supra,* 13 Cal.3d 663, two of our decisions preceding *Wimberly,* are not contrary to this conclusion. In both cases we upheld the validity of a police search of an automobile conducted without a search warrant. In *Dumas,* we did emphasize that the police were aware that a nearby acquaintance of the defendant might have removed or destroyed any evidence if the police had not acted immediately. (See 9 Cal.3d at p. 885.) However, in *Dumas* we did not require that the police, having seized the car, must thereafter postpone a search of the vehicle until a warrant was obtained. Rather we approved an immediate on-the-scene

search of the car, implicitly adopting the United States Supreme Court's rationale in *Chambers* v. *Maroney* (1970) 399 U.S. 42, 52 [26 L.Ed.2d 419, 428-429, 90 S.Ct. 1975], that "For constitutional purposes, [there is] no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." (See also *People* v. *Laursen, supra,* 8 Cal.3d 192, 201.) Because the mobility of the car in the present case clearly justified an immediate seizure, both *Chambers* and *Dumas* demonstrate the legitimacy of the contemporaneous, on-the-scene search.

In *Cook,* we pointed to a variety of factors, which in that case demonstrated the particular "exigency" supporting an immediate search. (13 Cal.3d at p. 669.) These included the lateness of the hour, the remote location of the car, the comparative number of police officers and suspects present on the scene and the need to prevent any "possible break in the chain of possession" of the suspected evidence. In *Cook,* however, we did not suggest that the foregoing factors were essential to the validity of the search nor did we purport to overrule or disapprove the numerous earlier California decisions upholding immediate on-the-highway searches of automobiles which did not involve the various circumstances recounted in *Cook.* Moreover, as we have seen, *Wimberly,* which succeeded *Cook* and which cited the *Cook* decision on this point, upheld a warrantless search of a car's passenger compartment in the absence of many of the specific facts to which *Cook* had adverted.

In virtually every case the postponement of an on-the-scene automobile search until a warrant is obtained will entail some "risk of a possible break in the chain of possession" of the evidence (13 Cal.3d at p. 669) as well as considerable administrative expense and delay. Moreover, there is a demonstrable need for clear guidelines by which the police can gauge and regulate their conduct, rather than a complex set of rules dependent upon the particular facts regarding the time, location and manner of the highway stop. ■ Accordingly, we hold that probable cause to believe that a lawfully stopped automobile contains contraband justifies an immediate warrantless search of the automobile despite the absence of any additional exigent circumstances.

## 2. *Search of the Glove Compartment*

As to the glove compartment search, we again find the controlling principles enunciated in *Wimberly.* There, the police officers, in addition to searching the passenger compartment of the car, also opened and conducted a search of the car trunk. Because we concluded that the facts known to the police officers did not provide probable cause to believe that additional contraband was located in the trunk, we invalidated the search of the trunk.

■ Under the reasoning of *Wimberly,* the search of the glove compartment in this case was clearly proper, for here, unlike that case, the police officer did have reasonable cause to believe that seizable items might be located in that compartment. As the investigating officer explained at the hearing on the suppression motion, prior to searching the glove compartment the police had ascertained that the suspects had no reliable identification on their persons; because a glove compartment is a traditional depository of a vehicle registration, the officers could reasonably believe that a search of that compartment would provide evidence of the suspects' identification. (See, e.g., *Curry v. Superior Court* (1970) 7 Cal.App.3d 836, 844 [86 Cal.Rptr. 844]; *People v. Brown* (1970) 4 Cal.App.3d 382, 387 [84 Cal.Rptr. 390].) Moreover, because the compartment was located in such close proximity to the occupants, the officer reasonably concluded that the weapon used in the robbery might well have been hidden by the suspects in the glove compartment during the five-minute police chase of the vehicle. Thus, we agree with the United States Supreme Court in *Ross, supra,* that the scope and character of a vehicle search based on probable cause is limited by the reason for the search and the kind of object believed to be concealed. Probable cause to search for a stolen television set, for example, would not justify a search of the glove compartment; probable cause to search for identification would extend to the glove compartment, but would not permit cutting open the car's seat cushions.

Defendant contends that even if the police did have probable cause to search the compartment, such a warrantless search is nonetheless improper unless the police can point to exigent circumstances which require such an immediate search over and above those circumstances which justify a warrantless search of the passenger compartment of the car. A few Court of Appeal decisions may lend some support to the defendant's contention in this regard. (*People v. Gott* (1979) 100 Cal.App.3d 1, 3-4 [173 Cal.Rptr. 469]; *Jackson v. Superior Court* (1977) 74 Cal.App.3d 361, 368 [142 Cal.Rptr. 299]; *People v. Jochen* (1975) 46 Cal.App.3d 243 [119 Cal.Rptr. 914].) However, the expressions in these opinions find no support in *Wimberly* and, in addition, conflict with the great majority of post-*Wimberly* Court of Appeal decisions involving the validity of automobile trunk searches. (See, e.g., *People v. Galosco* (1978) 85 Cal.App.3d 456, 462 [149 Cal.Rptr. 407]; *People v. Fraijo* (1977) 78 Cal.App.3d 977, 981-982 [144 Cal.Rptr. 424]; *People v. Superior Court (Karpel)* (1976) 63 Cal.App.3d 990, 993-994 [134 Cal.Rptr. 174]; *People v. Briggs* (1976) 62 Cal.App.3d 817, 821-822 [133 Cal.Rptr. 323]; *People v. Podesto* (1976) 62 Cal.App.3d 708, 719-720 [133 Cal.Rptr. 409].) Accordingly, to the extent inconsistent herewith, *Gott, Jackson,* and *Jochen* are hereby disapproved.

In *Wimberly,* we analyzed the propriety of the search of the car trunk, quoting with approval the reasoning of an earlier Court of Appeal opinion, *Peo-*

*ple* v. *Gregg* (1974) 43 Cal.App.3d 137 [117 Cal.Rptr. 496]. *Gregg,* in turn, explained that while facts evidencing casual drug usage "do not aid in the determination of whether marijuana might be concealed in the trunk" (p. 143), nevertheless, "the lawful observation of marijuana debris on a seat or the floor of the interior of the car . . . would give probable cause to believe that marijuana might be found in the areas *adjacent and immediately accessible to the occupants,* such as ashtrays, a passenger console, a *glove compartment* and underneath and between the seats" (last italics added, p. 142).

Finding the *Gregg* reasoning "eminently sound" (16 Cal.3d at p. 572), we concluded in *Wimberly* that under the facts before us in that case *"It was thus proper to search adjacent areas of the vehicle* [citation], but it was not reasonable to infer that petitioners had additional contraband hidden in the trunk." (*Id.,* italics added, fn. omitted.) Because there were no special exigent circumstances present in *Wimberly* our explicit approval of a search of "adjacent areas" of the vehicle, such as the glove compartment noted in *Gregg,* makes it clear that under *Wimberly* so long as there is probable cause to search the glove compartment an immediate search of that compartment is as permissible as an immediate search of the passenger compartment. (See also *id.,* at pp. 568-570 [discussing prior cases in which a warrantless search of a car trunk was upheld when there was probable cause to search the entire car].) As noted, the great majority of Court of Appeal decisions since *Wimberly* have upheld the validity of automobile trunk searches without requiring any "special" showing of exigency.

We hold that the officer's warrantless search of the glove compartment was fully justified.

### 3. *Search of the Shaving Kit*

Having concluded that the police officers acted lawfully in entering and searching the passenger compartment of the car and in searching the glove compartment, our final inquiry is to determine whether, lacking a warrant, the officer erred in opening the opaque shaving kit found inside the glove compartment. The police officer in this case opened the kit in question only after he had inadvertently discovered, in the course of an entirely legitimate seizure of the kit, that it in fact contained a handgun. Although the inadvertent discovery in this case resulted from the police officer's sense of touch, the knowledge that he thereby gained was as meaningful and accurate as if the container had been transparent and he had seen the gun within the container. Under these circumstances, and given the potential danger posed by the handgun, the officer's conduct was both eminently reasonable and constitutional.

The foregoing conclusion is directly supported by two of our earlier decisions. In *Guidi* v. *Superior Court* (1973) 10 Cal.3d 1 [109 Cal.Rptr. 684, 513 P.2d 908], the police during the course of a lawful search of a residence for suspects found a closed paper bag which emitted an odor of marijuana and which they had probable cause to believe contained such contraband; the police, acting without a warrant, seized the closed bag, opened it and removed the contraband. In *Guidi* we upheld both the seizure and the ensuing search of the bag, reasoning that under the circumstances it was obvious that the closed container held contraband and little else and consequently that the immediate seizure and search of the bag "constituted a minimum infringement of privacy." (10 Cal.3d at p. 18.)

More recently, in *People* v. *Lilienthal* (1978) 22 Cal.3d 891 [150 Cal.Rptr. 910, 587 P.2d 706], we concluded that a police officer violated no constitutional principles when he seized and opened a neatly folded square piece of paper which had inadvertently fallen from a suspect's wallet. Explaining that in light of the officer's experience he could reasonably conclude that the distinctively folded paper contained contraband, we upheld the immediate on-the-scene seizure and search of the item, implicitly recognizing that the distinctive outward appearance of the paper had effectively revealed the contents and rendered any additional infringement of privacy from the opening of the packet constitutionally insignificant. (22 Cal.3d at p. 899.)

Similarly, the Court of Appeal in *People* v. *Guy* (1980) 107 Cal.App.3d 593 [165 Cal.Rptr. 463], recently confronted facts quite similar to those in the in-stant case, with a result confirming the propriety of the search at issue here. In *Guy,* a police officer who had probable cause to search the trunk of a car for contraband, discovered in the trunk a large plastic baggie containing a white object. Upon lifting the baggie, he felt a pliable powdery substance and concluded that he was holding either cocaine or heroin. He then opened the baggie immediately and found a white powder which was revealed, upon analysis, to be a pound of PCP, a controlled dangerous drug.

On appeal, the *Guy* defendant claimed that the contents of the baggie should have been suppressed because the baggie was opened without a warrant. The Court of Appeal rejected the argument, reasoning that the officer had a right to seize the baggie without a warrant and that "Upon lifting the baggie, [the officer] was able to conclude it contained a controlled substance . . . . Since the contraband here was virtually in plain sight once the baggie was in hand, we find that expectations of privacy in the container were no greater than in the automobile. To insist the officer should have obtained a search warrant before opening the baggie to further identify the powder would be unreasonable. The contraband was in plain sight. 'To hold otherwise, would be to "magnify technicality at the expense of reason." ' [Citations.]" (107 Cal.App.3d at pp. 599-600, fn. omitted.)

We find significance in an additional factor which makes the immediate opening of the container in the case before us even more reasonable than the comparable police actions in *Guidi, Lillienthal* and *Guy.* Here the officer inadvertently discovered that the shaving kit contained a handgun, an extremely dangerous instrument posing significant and immediate risks both to the police and to members of the public in the immediately surrounding area. Because the store clerk had informed the officers that the armed robber had threatened to shoot him, the officer had reason to suspect that the gun might well be loaded. Even if we assume that the suspects were secured sufficiently so that there was no significant danger that they could seize the weapon, we think that common prudence supported the police officer's decision to render the gun inoperable before transporting it in order to avoid its accidental discharge. We have no doubt that the officer's inadvertent discovery that the shaving kit in the instant case contained only a handgun rendered his subsequent opening of the kit and dismantling of the weapon beyond constitutional reproach. (Cf. § 12031, subd. (e), authorizing police inspection of firearms; *People* v. *Johnson* (1982) 30 Cal.3d 444, 450-451 [179 Cal.Rptr. 209, 637 P.2d 676].)

Thus, we conclude that the trial court properly determined that the police officers' search of car, glove compartment and shaving kit did not violate constitutional principles and correctly refused to suppress the gun which was discovered in the course of the search. In light of our conclusion that the police conduct in this case was proper both under *Ross* and under our own controlling "automobile exception" and "container" authorities, we have no occasion to determine whether any or all of the searches at issue could properly be sustained under a "search incident to arrest" theory. (Cf., e.g., *New York* v. *Belton* (1981) 453 U.S. 454 [69 L.Ed.2d 768, 101 S.Ct. 2860]; *People* v. *Brisendine, supra,* 13 Cal.3d 528.)

The judgment is affirmed.

Mosk, J., Kaus, J., and Broussard, J., concurred.

**BIRD, C. J.**—Concurring and Dissenting.—I concur in the judgment of my colleague, Justice Richardson. However, I would reach that result by a different route.

I.

Section 1 of the majority opinion contains a discussion of the validity of the warrantless search of the car's interior. That discussion is basically dictum since appellant failed to challenge this aspect of the police conduct at the motion to suppress in superior court and during the course of this appeal. Thus, the

issue of whether or not the California Constitution required the officers to obtain a warrant before entering and searching the interior of appellant's car has not been presented to us for decision.

Indeed, having failed to mention this theory in the superior court, appellant is precluded from raising it for the first time on appeal. (See, e.g., *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People* v. *Pranke* (1970) 12 Cal.App.3d 935, 939-942 [91 Cal.Rptr. 129].) Given this procedural defect, this court, too, is precluded from deciding the issue favorably to appellant, regardless of our views of the theoretical merits. The discussion in section 1 of the majority opinion is, therefore, dictum.

Appellant has challenged only the warrantless entry into the glove compartment. By conceding the validity of the search of the passenger compartment,[1] he is arguing that the warrant requirement is stricter with respect to glove box searches than to searches of the open interior. In my view, however, these two searches cannot be separated for purposes of obtaining a warrant. If no warrant is necessary to undertake a full-blown search of the passenger compartment, none should ordinarily be required to search the glove box.

This is so because the factors that may justify dispensing with a warrant for a passenger compartment search will generally apply to a search of a glove box as well. Traditionally, those factors involve the existence of " 'exigent circumstances [which] render[] the obtaining of a warrant an impossible or impractical alternative . . . .' " (*People* v. *Cook* (1975) 13 Cal.3d 663, 669 [119 Cal.Rptr. 500, 532 P.2d 148].) Among these are considerations relating to the "highly movable nature" of automobiles. (See *People* v. *McKinnon* (1972) 7 Cal.3d 899, 908 [103 Cal.Rptr. 897, 500 P.2d 1097].)

Obviously, considerations of mobility will not be different for glove boxes than for passenger compartments. Both are permanently affixed to the same frame. Where one travels, the other must necessarily go. If one is in danger of being moved out of the jurisdiction, the other cannot be deemed to be more secure. And when there are other types of exigencies that operate to excuse police officers from obtaining a warrant prior to searching a car's passenger compartment, those exigencies will likely be applicable to a glove box search as well.

Since appellant conceded the validity of the warrantless passenger compartment search, despite having both the motive and opportunity to challenge it if illegal, the considerations just discussed would seem to dictate the result in this

---

[1]Appellant clearly had a motive to challenge the search of the passenger compartment if he thought it illegal, since it resulted in the discovery and seizure of incriminatory evidence from beneath the front seat.

case. Appellant has offered no reason relating to exigency or mobility for treating the warrantless glove box search differently. I would, therefore, uphold it.

I am aware that recent decisions of the United States Supreme Court have proffered an additional reason to justify dispensing with a warrant in some situations where automobiles are to be searched. That court has determined that under the federal Constitution, automobiles are associated with a "diminished expectation of privacy." (*United States* v. *Chadwick* (1977) 433 U.S. 1, 12 [53 L.Ed.2d 538, 549, 97 S.Ct. 2476].)

Analysis of the reasons underlying the Supreme Court's conclusion might suggest that a warrant should normally be required for searches of glove compartments and trunks. Unlike the passenger compartment, a glove box "is intended as a repository of personal effects," and its contents "are not open to public view." (See *id.,* at p. 13 [53 L.Ed.2d at p. 549].) Indeed, in terms of a justifiable expectation of privacy, a glove box is hard to distinguish from a trunk, and in *Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557, 567-571 [128 Cal.Rptr. 641, 547 P.2d 417], this court specifically held that there is a "reasonably greater expectation of privacy" in a trunk than in the passenger compartment.[2]

Nevertheless, I hesitate to import the *Chadwick*-type reasoning into the California Constitution in every conceivable situation where it might be seen to apply. When courts perform their duty to translate the broad constitutional commands regarding seizures and searches into everyday rules governing police officers in the street, the rules that are fashioned must be clear and

[2]I thus confess to being perplexed by the majority opinion's conclusion that *Wimberly* contains "the controlling principles" for rejecting appellant's arguments in the present case. (See maj. opn., *ante,* at p. 469.) *Wimberly* held that probable cause to search the passenger compartment of a car is not necessarily sufficient to justify the search of the car's trunk. (16 Cal.3d at p. 568.) The question whether a search warrant might be required to justify a trunk search (or a glove box search) was not raised in *Wimberly,* and this court did not mention it, let alone set forth a "controlling principle." "Cases are not authority for propositions not considered." (*In re Tartar* (1959) 52 Cal.2d 250, 258 [339 P.2d 553].)

Today's majority opinion also seeks support for its conclusion from language in *People* v. *Gregg* (1974) 43 Cal.App.3d 137 [117 Cal.Rptr. 496] which this court quoted with approval in *Wimberly.* (See 16 Cal.3d at p. 572.) But the *Gregg* language regarding glove compartments was remote dictum, as no issue relating to a glove box search was raised by the parties or presented by the facts of that case. Clearly, *Wimberly* did not elevate the *Gregg* language to a higher status, since *Wimberly* likewise did not involve a search of a glove box and did not consider the possible need for a warrant.

Even in light of such extraordinary use of precedent, the majority opinion's treatment of *People* v. *Jochen* (1975) 46 Cal.App.3d 243 [119 Cal.Rptr. 914] is surprising. *Jochen* did involve a glove compartment search. The Court of Appeal squarely held the searches of a trunk and a glove box to be unlawful for lack of a warrant. Moreover, *Jochen* was cited with approval on this point by *Wimberly.* (16 Cal.3d at p. 568.) Notwithstanding, today's majority opinion disapproves *Jochen* on the basis of *Wimberly* and the *Gregg* dictum. (Maj. opn., *ante,* at pp. 470-471.)

workable. (See *In re Tony C.* (1978) 21 Cal.3d 888, 903-904 [148 Cal.Rptr. 366, 582 P.2d 957] (conc. & dis. opn. of Bird, C. J.).) The officer acting in the field must be able to determine, quickly and with some certainty, what it is that the Constitution demands of him or her.

There may well be a strict, logical basis for applying a *Chadwick* analysis so as to afford the protection of the warrant requirement to glove boxes and trunks but not to the passenger compartments to which they are unalterably attached. (See text accompanying fn. 2, *ante.*) However, such a fine distinction does not promote the goal of a workable Fourth Amendment. Thus, I would hold under the California Constitution that the rules regarding the need for obtaining a warrant must be the same for all unseverable portions of an automobile.

Of course, this leaves unanswered the question as to what those rules should be. The answer to that question must await a case in which it is squarely posed. As already noted, appellant in the present case merely contends that a warrant is required to search the glove compartment even when not required to search the car's interior. On this issue, the California Constitution does not and should not agree with him.

## II.

The second issue to be decided is whether the warrantless entry into the opaque shaving kit was unlawful, notwithstanding that the police were constitutionally entitled to enter and search the glove compartment without a search warrant. As this court has held, "A warrantless search of closed containers found within an automobile involves considerations separate from those involved in a warrantless search of the interior of the automobile, and it must be justified by some recognized exception to the warrant requirement." (*People* v. *Dalton* (1979) 24 Cal.3d 850, 855-856 [157 Cal.Rptr. 497, 598 P.2d 467].)[3] These exceptions generally involve the existence of exigent circumstances which render it impractical to obtain a search warrant.

---

[3]Unlike a rule that would differentiate between distinct but unseverable portions of a car for purposes of the warrant requirement, this rule seems workable. A closed container may readily be removed from an automobile. Moreover, it is a "common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." (See *Arkansas* v. *Sanders* (1979) 442 U.S. 753, 762 [61 L.Ed.2d 235, 99 S.Ct. 2586].) Indeed, the justifiable expectation of privacy in closed containers is "substantially greater than in an automobile." (*United States* v. *Chadwick, supra,* 433 U.S. at p. 13 [53 L.Ed.2d at p. 549]. See also *People* v. *Dalton, supra,* 24 Cal.3d at pp. 855-856.) As a result, a warrant is normally required to search closed containers, unless exigent circumstances make obtaining a warrant impractical. (*Ibid.*)

Consequently, police officers understand that closed containers generally are covered by the warrant requirement. No confusion is caused by requiring officers to apply this same rule to a closed container wherever found, even it if happens to be located in an automobile. (But cf. *United States* v. *Ross* (1982) 456 U.S. 798 [72 L.Ed.2d 572, 102 S.Ct. 2157].)

In the present case, the officer had ample probable cause to believe that the shaving kit contained the loaded handgun just used in a robbery. He also was entitled to continue looking amongst the other items in the glove box for the bills taken in the robbery. Under these circumstances, he clearly was entitled to enter the thin plastic shaving kit and secure the weapon to ensure that it did not accidentally discharge while he was carrying out his duties. Obtaining a warrant was impractical, and hence compliance with the warrant requirement was excused. We need go no further in upholding the warrantless search of the shaving kit.

However, the majority opinion takes a more circuitous route to reach this straightforward result. It appears to hold that because the officer "discovered" the shaving kit's entire contents "inadvertently"[4] through his sense of touch, those contents were "in plain view" for constitutional purposes. (Maj. opn., *ante*, at pp. 470-473.) Rather than being entitled to the protection of the "closed container" cases, the contents could be seized in accordance with the principle that evidence of a crime discovered in plain view during the course of an otherwise lawful search may usually be seized without a warrant.[5] If this is the holding, it is problematic.

There can be no serious quarrel with the proposition that information obtained through a police officer's sense of touch may be relied upon in determining probable cause to search. But absent exigent circumstances, our state and federal Constitutions require more than the existence of probable cause to justify an intrusion into a closed container. To ensure accuracy in the probable cause determination, they also demand that an impartial magistrate, rather than a police officer, make the decision as to whether or not the facts known to the police amount to probable cause. (See, e.g., *United States* v. *Chadwick, supra,*

---

[4]The majority opinion's repeated references to the "inadvertent" nature of the officer's tactile discovery indicate that the concept is important to today's decision. However, it is difficult to describe the discovery of the handgun as truly "inadvertent," since the officer was searching the glove box for the precise purpose of locating the pistol which he "discovered" in the shaving kit. What the majority opinion means by "inadvertent" is, I believe, "without tactile probing, examination, or manipulation." Resorting to such manipulations would amount to a search. (See, e.g., *Leake* v. *Commonwealth* (1980) 220 Va. 937 [265 S.E.2d 701]; *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].)

[5]The difference in analysis between myself and the majority opinion is more than just an academic exercise. Under the majority opinion's reasoning, the nature of the contents of a closed container is unimportant. Once a police officer is able to deduce those contents from "inadvertent plain feel," he or she is permitted to make a warrantless entry into the container. The contents of an opaque toiletries kit would be "in plain view"—and hence warrantless entry into the kit would be permitted—regardless of whether it was believed to contain a gun, a checkbook, or a birth control device.

An approach which would be more sensitive to constitutional privacy rights would permit warrantless entries based on the dangerous nature of the item reasonably believed to be inside the container and on the attendant need, if any, for immediate action to prevent serious injury or death.

433 U.S. at p. 9 [53 L.Ed.2d at p. 547]. See also *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 449-453 [29 L.Ed.2d 564, 572-575, 91 S.Ct. 2022].)

This carefully crafted constitutional framework is entirely circumvented by the majority opinion's conclusion that the officer's inadvertent tactile discovery of the entire contents of the shaving kit amounted to a discovery of evidence "in plain view." It allows the police rather than a neutral magistrate to determine when the contents of a closed container may be exposed and seized.

This is not a sound extension of "plain view" principles. The "inadvertent" tactile sensations in this case could have been produced by a harmless starter pistol, a well-made toy, or a small electric drill. Perhaps, given hindsight and factors other than the officer's tactile perceptions, these alternative possibilities may seem remote. However, the fact remains that the tactile information by itself was open to interpretation in ways that a true "plain view" would not have been. Moreover, "[n]o amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" (*Coolidge* v. *New Hampshire, supra,* 403 U.S. at p. 468 [29 L.Ed.2d at p. 584]. See also *id.,* at p. 451 [29 L.Ed.2d at p. 574.) Thus, the fact that the contents of the shaving kit were "inadvertently discovered" by sense of touch should not by itself have rendered a magistrate's neutral judgment superfluous.

The *Chadwick* decision itself shows that the majority opinion's "plain view" analogy cannot be applied to this case, even under federal law. In *Chadwick,* officers seized and searched without a warrant a locked footlocker which had been shipped to Boston by a man who matched a drug-trafficker profile. Prior to the search, the police knew from "plain view" observations that (1) the footlocker was leaking talcum powder, a substance often used to mask the odor of marijuana, and (2) a trained police dog had signalled the presence of marijuana in the footlocker.[6] (433 U.S. at pp. 3-4 [53 L.Ed.2d at p. 543].)

In light of these "plain view" perceptions, it was a virtual certainty that the footlocker contained contraband. (See 433 U.S. at p. 15 [53 L.Ed.2d at p. 551].) Surely, the officers' "plain view" perceptions in *Chadwick* led to an inference about the footlocker's contents that was no less certain than the inference to be drawn from "plain touch" as to the contents of appellant's shaving kit. Nevertheless, the Supreme Court in *Chadwick* held that a warrant was required to enter into and search the footlocker. Today's case cannot be meaningfully distinguished from *Chadwick* on the basis of what is deemed to be "in plain view."

---

[6]This court has recently held that such activities of a trained detector dog fall within the "plain view" rubric. (*People* v. *Mayberry* (1982) 31 Cal.3d 335, 340-342 [182 Cal.Rptr. 617, 644 P.2d 810].)

It is critical to remember that appellant did not rely solely on the privacy of the glove box in his attempt to protect his property. By placing the pistol inside the opaque shaving kit, closing the kit, and only then placing the kit inside the glove box, appellant demonstrated a justifiable expectation of privacy beyond that which would have existed if the property had been left "exposed" to intruders into the glove box. His extra efforts may not have brought him within the scope of the warrant requirement for other reasons which I have noted. But to hold that the pistol was effectively "in plain view" inside the glove box is to lose sight of the essential facts of this case.

## III.

In sum, I agree with my colleagues that the trial court properly denied appellant's motion to suppress the gun and shaving kit. I do so without reaching the question of whether a warrant might have been necessary to enter and search the passenger compartment of the automobile in which appellant was riding. That issue has not been presented to this court. The trial court properly denied the suppression motion for other reasons.

Appellant's petition for a rehearing was denied March 23, 1983.